[Civil No. 1369.   Filed June 12, 1914.]

[144 Pac. 950.]

ARTHUR J. McDONALD, as Executor, LILLIAN Mc-
DONALD and ALICE McDONALD, as Executrices of
the Last Will and Testament of J. S. McDONALD, De-
ceased, as Devisees of Said J. S. McDONALD, Deceased,
and as Trustees of an Express Trust Under the Said Last
Will and Testament of Said J. S. McDONALD, Deceased,
Appellants, v. J. T. McDONALD, G. F. POWELL,
CHARLES QUITTY, JOHN DOE and THE PORT-
LAND MINING COMPANY, Appellees.

1. MINES AND MINERALS—MINING CLAIMS—ASSESSMENT WORK—PER-
FORMANCE—EVIDENCE.—In a suit to recover mining claims, evidence
*held* to require a finding that assessment work performed on the
claims prior to December 11, 1911, by defendant M. was for his
own personal benefit, and not primarily for the benefit of the estate
of his brother, which at that time was the owner of the claims.

2. MINES AND MINERALS—TRESPASS ON MINING CLAIM.—Where defend-
ant M. went on a group of mining claims then owned by his brother's
estate to perform the annual assessment work in order to protect
the estate's title for M.'s personal benefit, that he might from the
claims collect an alleged indebtedness of the estate to himself, and,
while engaged in the work, occupied a cabin on the ground, he was
not a trespasser, but his occupancy was the possession of the estate.

3. MINES AND MINERALS—MINING CLAIMS—ASSESSMENT WORK—RELO-
CATION.—Where plaintiffs did no assessment work on a group of
mining claims for the year 1911 until January 16, 1912, the claims
became forfeited and subject to relocation after 12 o'clock midnight
on December 31, 1911, and relocations made after that time and
prior to the plaintiff's commencement of assessment work on the
claims were prior in right.

4. MINES AND MINERALS—LOCATION OF CLAIMS—ASSESSMENT WORK—
RELOCATION.—Assessment work performed on mining claims after
the expiration of the year for which the work was done, and after
the claims had been relocated, is ineffective to restore the rights
of the original locators.

5. MINES AND MINERALS—LOCATIONS OF CLAIMS—ASSESSMENT WORK.—
Assessment work performed on a group of mining claims is insuffi-
cient to sustain a title to a claim disconnected from the group.

6. MINES AND MINERALS—MINING CLAIMS—ASSESSMENT WORK—RELO-
CATION.—Assessment work done by original locators on ground after

it had been legally relocated was unavailable to save an adjoining claim from relocation, on the ground that the work tended to develop such adjoining claims.

[As to discovery of mineral in mining claims and rights of locator prior thereto, see note in 139 Am. St. Rep. 154. As to abandonment or forfeiture of mining claims, see note in 87 Am. St. Rep. 403.]

APPEAL from a judgment of the Superior Court of the County of Santa Cruz. Frank J. Duffy, Judge. Affirmed.

STATEMENT OF FACTS BY THE COURT.

J. S. McDonald in his lifetime owned seven certain mining locations situate in Santa Cruz county, near Oro Blanco, called the Golden Eagle group. He died during the year 1909, leaving a will mentioning said group, which recites that:

"The title to said properties is in my sole name, but my brother, John T. McDonald, is entitled to the balance of one-half of the proceeds of a sale of said property after repayment to me of all expenses incurred by me in and about said properties and the repayment of all moneys advanced to or expended by me on behalf of my said brother, and the repayment of all moneys expended by me for the support, education, and maintenance of the children of my said brother.

"My interest therefor in said property consists of an undivided one-half and in addition an interest equal to the total amount of all of said expenditures.

"My books of account show all of said expenditures, but, in addition, an agreement has been or will be executed between my said brother and myself which will definitely fix the amount or amounts so due me, which said agreement and the attached statement or statements shall control my said executors."

The plaintiffs were appointed executor and executrices of the will, and were children of the testator, while John T. McDonald, named in the will, was a brother, and is one of the defendants here. The plaintiffs reside in Chicago. Defendant J. T. McDonald has made his home in Sonora, Mexico, or in a cabin on the claims near Oro Blanco during many years past.

During the year 1909, $174.25 worth of work was done under the direction of J. T. McDonald as the annual assessment

work for that year representing said claims. J. S. McDonald was sick, and Arthur J. McDonald, one of the executor plaintiffs, now one of the appellants, for the testator furnished J. T. McDonald $100 of that sum paid during that year. The balance of the cost of the work for that year was paid by J. T. McDonald in cash and by a duebill for $62. No other assessment work was done on the group for the year 1909. During the year 1910 J. T. McDonald held a power of attorney from the estate of the testator, on its face authorizing him to negotiate a sale of the mines for the estate. Under such authority, he entered into an optional contract with one Posey for the sale, and during the life of the option Posey performed work on six of the locations, the Rob Roy, Golden Eagle, Arthur John, Golden Bird, Rockwell and Lubec, in the course of taking samples of ore. This work was worth $150. In addition, J. T. McDonald hired two men to work during that year for a time. They worked on the Rob Roy and Golden Eagle locations, and $12 worth of the work was done on the Rockwell. A house was on the Rockwell. The entire work done under the direction of J. T. McDonald for the year 1910 upon the said three claims cost $142.75. The estate furnished to J. T. McDonald during that year $300. This money was expended by him in payment of the duebill for $62; and in payment for the work and material, $142.75; $40 for provisions; and the balance for personal expenses. The entire work on the six claims done by Posey and J. T. McDonald for 1910 was $292.74. On November 15, 1910, the estate revoked the power of attorney held by J. T. McDonald. During the year 1911 J. T. McDonald was making his home in Mexico. In September of that year he wrote requesting the estate to send him money with which to perform the assessment work on the mines for that year. The representative of the estate failed to send the money requested. In October, 1911, J. T. McDonald voluntarily put a man to work on the Rob Roy location, and personally went to Chicago, and had a conference with the representatives of the estate, with a view of collecting a large sum of money due him from the estate, but in no manner connected with the mines. They informed him that the estate had no money with which to pay J. T. McDonald his claim, and it was no use to talk about the mines if it was money he wanted. Defendant then returned

to Sonora, Mexico, and ordered the man to stop work on the mines. He personally paid the man for the work done, and has not been repaid by the estate. On December 20, 1911, defendant J. T. McDonald went to the mines in person to, and he started and did, resume work thereon in order to save the property to the estate so that he might be able to sell the mines and take out of the proceeds of the sale the money owing him from the estate, believing that he had some estate in the mines through the will of his brother. He started the work on the 23d day of December, 1911, with one man working for a wage of $2 per day. This man worked on the mines five days, and quit, for which work defendant paid. Another man worked five days on the Rob Roy at $2 per day, and quit on December 28, 1911, for which defendant paid him. No other work was done on any of the locations for the year 1911. These facts relate to the assessment work performed for the years 1909, 1910 and 1911, and are undisputed by the evidence.

About December 26, 1911, the representatives of the estate sent H. H. Linney to Nogales to examine the records relative to the mining locations, and to the claims to see about the property and about having the assessment work done, if the claims were valid. Mr. Linney arrived at the property about 5 o'clock in the evening on December 28, 1911, and found J. T. McDonald at a cabin on the Rockwell, one of the locations of the group. He informed McDonald that he came to see about the property and about having the assessment work done, if the claims were valid. He informed McDonald that he did not have all the money necessary to do the work. He stated:

" . . . I was only interested at that time in seeing that the work was done on the property, or that work was resumed before the end of the year, so the property would not become subject to relocation. . . . I told Mr. McDonald that money had been provided for the purpose of doing assessment work; that it would be sent to me immediately upon my wiring that the claims were still valid, and that the work could be started. I asked him why he was in a house there located on one of the claims, and he said he was there to see about the property."

Mr. Linney asked Mr. McDonald: "Will you agree to stay here and protect the property by resuming work immediately,

either by yourself or persons whom you may engage, and prosecute that work throughout the rest of 1911 and through 1912, until you hear from me further and we make definite arrangements as to the terms of the contract for completing the work?''

He said he would. ''I said: 'You understand I have not the money and that it will be necessary for me to get the money after I leave here, but for what work you may do in the meantime, I will guarantee personally that you will receive pay for it yourself, or whoever does the work under your direction will receive such money as will be necessary to carry on the work until you hear from me further'; that I would send the telegram from Nogales, and as soon as the money reached me in Prescott I would send him a wire that I had the money. He said that he would not rely upon his relatives, that he did not believe their promise about sending the money, etc.; and I said, 'Mr. McDonald, I have no way of proving to you that I have the money, except by wiring—by sending you a telegram.' I said, 'Would it be satisfactory to you and sufficient proof that I have the money, if I wire you that I have the money?' and he said that would be satisfactory. I said, 'Well, then, I will send you a wire whether or not I have the money on that day. If the money is there, we will then make arrangements as to favorable terms for doing the work on the contract basis, and I will make a contract with you, as I have been advised by my clients to make a contract, if possible, instead of having the work done by the day.' He said he would agree to do those things; that he would protect the property by resuming the work on the next day and continue it through December and in January, at least to the 5th day of January. My reason for asking this is, as I explained to him, that the telegram which I would send him on Tuesday night might be held up in the station at Tucson until the following Wednesday morning, and, if held up in Tucson, and did not get the stage on Wednesday, it would not go out until Friday, and would not reach Oro Blanco until the night of the 5th, and he agreed to that.''

On January 2, 1912, Linney received $500, and under the same date wired to J. T. McDonald:

''Offer four hundred dollars for complete assessment work on group. Have money will send substantial amount on re-

ceipt of your acceptance by wire. Otherwise protect claims by work at wages until relieved.''

No answer was received from McDonald, and on January 7; 1912, Linney wrote him on the subject. On cross-examination, Mr. Linney said:

''I did make a definite contract with McDonald about the assessment work, except as to the definite amount that was to be paid, provided Mr. McDonald wanted to do the work in that way. The really definite part of the contract was that he should protect the property by wages, either for himself or someone he should put to work, until we could find out definitely and I could satisfy him that the money was there, and during that time the contract was definite that he should resume work either in person or through someone else. I took it at that time that he wanted to do it personally, as he said he needed the money, and from that time, and until we made definite arrangements as to the amount to be paid either to him or someone else, he was to do the work or to have it done, and he was guaranteed enough to cover that amount. . . . If the money was not sent, he was to be paid for the work done up to that time, which I guaranteed. It would probably amount to seven or eight days, at ordinary miner's wages.''

McDonald's version of what took place on the occasion of Mr. Linney's visit to the mines on December 28, 1911, and what was said at that time, is substantially as follows:

''Mr. Linney introduced himself, and said, 'Well, I represent, through Mr. Woods (of Chicago, a lawyer of McDonald's acquaintance) the estate of J. S. McDonald.' He asked me if I was doing any work on the mines, and I said, 'Yes; working two men on the mines.' He asked me if the Edith mine belonged to the estate, and I said, 'No,' and he said it appeared from the records that the estate owned the Edith mine. That was all he said about the mines. He asked me if I would do assessment work, and I said, 'Yes,' if he would give me the money. When he first came down there he said he came for the estate of J. S. McDonald, and I said, 'Have you any money?' and he said, 'No,' and I said, 'I am out of luck if you have no money,' and he asked me if I would work, and I said I would if he would give me the money. He said he didn't have it. . . . I didn't agree to do the assessment work until he could send me the money. He said something about

telegraphing, but I did not pay any attention to him as to what he said about it. He mentioned something about my staying in possession and he would pay me wages, but I did not agree to any arrangement for any wages. What I said was, 'If you will send me the money, I will do the work.' I would not do the work if he did not send me the money. I was doing the work—I was trying to do the work—regardless of Mr. Linney. I didn't tell him so. . . . I didn't say I would stay there and protect the property by continuing the work.''

Witness denies that he stated to Mr. Linney that if Mr. Linney would personally guarantee the work witness should do or may have done it would be satisfactory to witness. Witness told Mr. Linney that he could not rely upon his relatives' promise to furnish the money.

On January 6th witness received Linney's telegram offering to contract with witness to complete the work for $400, and stating that the sender had the money, and, if he did not accept, to continue work until relieved. Witness did not accept the offer nor continue work. The telegram was answered by letter, informing Mr. Linney that the property had been located by other parties, also stating:

''I made my very best efforts to save the property—I even borrowed money to do so—I could not depend upon my nephew to aid me. Had things been different at the late date I received your telegram, I would not have accepted or considered it.''

McDonald was not physically able to do the work, and could find no one to employ to do it.

To determine this disputed issue of fact the court framed and submitted to the jury the following interrogatory, the answer to which follows the interrogatory, to wit:

''Second interrogatory: Did J. T. McDonald enter into any agreement with the plaintiffs, or any of their agents, representatives, or attorneys, shortly before January 1, 1912, to the effect that he would perform any of the work or labor or procure the same to be done on said mining claims prior to January 1, 1912, and thereafter, for the purpose of protecting the title to said properties by resumption of work thereon? Verdict of jury: No.''

The court separately finds that no contractual relation existed between J. T. McDonald and plaintiffs by which McDonald agreed to do the assessment work or resume the performance of the assessment work on the mines for the year 1911. The court finds: That J. T. McDonald bore no fiduciary relation to the plaintiffs in the year 1911 or 1912. That the assessment work was not performed on the mines for the years 1909, 1910, nor 1911. Defendant Charles Quitty relocated the Lubec claim in September, 1911; C. F. Powell reached the mines on December 30, 1911. He made the cabin occupied by McDonald and Quitty his headquarters until noon on January 1, 1912. Between 12 o'clock midnight on December 31, 1911, to noon January 1, 1912, Powell relocated a part of the Golden Eagle group by making four locations. These locations were made without the knowledge of J. T. McDonald. On January 3, 1912, J. T. McDonald relocated a part of the group by making one location. That M. P. Dalton relocated one claim, taking therein a part of the group, on September 2, 1912.

Both Powell and Dalton conveyed their claims to the Portland Mining Company, defendant, after the commencement of this action.

On January 15, 1912, Mr. Linney, representing the plaintiffs, again visited the mines. On January 16th he put one man to work. Mr. Linney testifies that this work was "continued until about the 1st of August, until we had done more than $600 worth of work on the property." On cross-examination, he stated:

"I went to the claims on January 15th, and took a man with me, and showed him where to work, and he started to work on the morning of the 16th. I haven't been on the claims since that time. I know what work has been done there only from the man himself. . . . I do not know of my own knowledge what work was done on the claims during this year."

The court finds that J. T. McDonald and G. F. Powell did not enter into any conspiracy whatsoever, as alleged in the complaint, and that said J. T. McDonald did not abet or assist the defendant Powell in making his relocations of the ground, and that there was no fiduciary relationship of any kind whatsoever between either of the said defendants and plaintiffs. Evidence of the acts of relocation of the defendants' claims was offered and admitted. The court framed and submitted

two interrogatories to the jury, the second of which is set forth above, and the first with the verdict follows:

"First interrogatory: Did defendant, G. F. Powell in any way hinder, prevent, or dissuade J. T. McDonald from doing the assessment work for the year 1911, on or for the mining claims claimed by plaintiffs, any time prior to the time when said Powell made his relocations? Verdict of jury: No."

In addition to the findings of the jury, the court made special findings of facts, and, as conclusions of law therefrom, finds that the plaintiffs are entitled to no relief whatsoever, and that the defendants are entitled to a decree quieting their title to their mining claims against the plaintiffs, and rendered a decree accordingly.

From this decree and from an order refusing a new trial plaintiffs appeal.

Mr. H. H. Linney, for Appellants.

Mr. Selim M. Franklin and Mr. Frank J. Barry, for Appellees.

CUNNINGHAM, J.—The complaint of appellants sets forth two grounds or causes of action upon which their right to recover is based: First.  Upon the grounds that the annual assessment work for the year 1911 was commenced upon the Golden Eagle group during that year by J. T. McDonald, as the agent or representative of plaintiffs, and for and in behalf of the said estate, and that such work was directly resumed after an interruption on January 16, 1912, and thereafter completed prior to the completion of the relocations of defendants. The relocations of defendants were initiated during the said period of interruption of such work.  Second.  Upon the grounds that the relocations, while actually initiated before the plaintiffs resumed the performance of the annual work, cannot be effective against the rights of the plaintiffs in any event, for two reasons: First.  Because such relocations were initiated through a wrong and trespass committed by the relocators, in that the relocators wrongfully entered upon the rightful possession of plaintiffs before the expiration of the assessment year 1911, and thereby caused the performance of the annual work of plaintiffs to be suspended, and

the relocators continued their said trespassing during the remainder of said year, and, upon the expiration of that year, in the said manner they initiated their relocations. Second. Because plaintiffs commenced the performance of the annual work for the year 1911 through J. T. McDonald as their agent and representative for that purpose in the year 1911, and on December 28, 1911, they expressly contracted with McDonald to finish and complete the performance of the annual work for that year by continuing the work after the 1st day of January, 1912, until the full amount of said annual work was completed. That their said agent and representative, J. T. McDonald, conspired with the other defendants, and, in pursuance to such conspiracy, suspended the performance of such work on December 30, 1911, and, after the expiration of the year 1911, he aided and assisted the other defendants to relocate a part of the claims in their names, and relocated a part of the claims in his name, and for that reason defendants are estopped from claiming any rights by reason of their said relocations. And they for that reason hold such legal title as they acquired thereby in trust for the benefit of plaintiffs. Both causes of action are denied, and the defendants plead their relocations as valid relocations of abandoned property, and ask for affirmative relief.

The evidence produced fails to support the said first alleged grounds for recovery. Without conflict, the evidence tends to show that all the work done on the Golden Eagle group during the year 1911 was done and work ceased on December 30, 1911; that such work was done by J. T. McDonald for his own personal benefit, and not primarily for the benefit of the estate. The purpose McDonald had for causing the work to be done was to protect the title to the mines for the estate so that he could negotiate a sale, and out of the proceeds of such sale he could recover a large claim due him from the estate. The estate had no money with which to pay his claim, nor with which to pay for the annual work. If he did not protect the estate's title in the mines, and they were lost by relocation, all hopes of collecting his claim from the estate were gone. He had caused the annual work to be done for his brother for the year 1909; that is, he had caused some work to be done on the mines for that year, but not a full assessment. The expense thereby incurred amounted to $174.25. His brother, through

plaintiff Arthur J. McDonald, sent to him $100 in money to pay for that work. Defendant paid the balance with money of his own and a duebill for $62. J. S. McDonald died during the year 1909. Defendant was thereafter given a power of attorney by the representatives of the estate, the plaintiffs, which upon its face authorized him to sell the mines. While he held this instrument during the year 1910, he caused $150 worth of work to be done on six of the claims. This work was done by Posey while he held an option to purchase the property. Posey acquired the option through J. T. McDonald, as attorney in fact for the estate. Defendant McDonald also caused $142 additional work to be done on the mines during the year 1910. The estate furnished him $300 cash to be applied to the assessment work that year. The claim of the estate included a group of five locations, the Golden Eagle group, and one claim detached from the group known as the Lubec claim. On the last-named claim work was done for the year 1910 by Posey taking samples.

In November, 1910, defendant's power of attorney was revoked. In September, 1911, defendant wrote to plaintiffs concerning the annual work on the mines for 1911, and requesting money with which to perform such work. He received no reply to his request. He was then residing in Mexico. In order to protect the title, he put one man to work on the mines in October, and went to Chicago seeking a settlement of his claim from the estate. Then it was that he was informed by the plaintiffs that the estate had no money with which to pay his claim, or for any purpose connected with the mines. Defendant returned to Mexico, and stopped the man then at work on the mines at Oro Blanco. He paid personally for the work done on the mines under his orders, and made no claim against plaintiffs for repayment. On December 20, 1911, he went to the mines for the purpose of doing what he could to protect the title to the mines by resuming the work. His purpose in protecting the title was that he might be able to sell the mines for plaintiffs, and out of the proceeds of the sale recover his claim against the estate. He had no authority from the estate to cause the work to be commenced. He commenced the work voluntarily, and at his own personal expense and risk, and for his own benefit. In order to see

XVI Ariz.—8

to the work, he occupied a house on one of the claims of the group. Defendant Quitty occupied the house with him. On December 23, 1911, defendant started two men to work on the claims at an agreed wage of $2 per day. One man worked five days, and quit, for the reason he could get work nearer his home. The other man worked five days on the mines, and one day packing and providing wood for the camp; after which he quit, for the reason he was sick. For all of which work defendant McDonald paid. For that purpose he borrowed $100 from a friend. He made no charge against the estate. The plaintiffs knew he had had men at work on the mines. On the 28th of December, 1911, about 5:30 P. M., plaintiffs sent a representative to the mines to see if the mines were valid, and, if so, to arrange to have the annual work done. Plaintiffs' representative said nothing about the work defendant was having, and had had, done on the mines, although he was informed of the fact. He made no offer to pay for the work nor to continue the work for plaintiffs. Plaintiffs' representative admitted that plaintiffs had not furnished him with money with which to pay for the annual work, but stated that he was informed that money had been provided for that purpose. This representative expressed a desire to arrange with defendant McDonald to perform the annual work on the group of claims for the plaintiffs. The arrangement the representative desired to make was that McDonald would commence the work immediately and continue the work during the remaining days of the year 1911, and continue the work in January until the representative could notify him that the money to pay for the entire annual work had reached the representative at Prescott. As an inducement to agree to this arrangement, the representative offered to personally guarantee to McDonald wages for the work done up to the time McDonald could receive such notice, not later than January 5, 1912. The further promise was made as a further inducement to McDonald that the representative when he received the money, would award the contract to McDonald to complete the annual work. The plaintiffs contend, and introduced substantial evidence in support of their contention, that McDonald accepted plaintiffs' said offer, and thereby agreed to commence the annual work on the claims for plaintiffs immediately after December 28, 1911, and continue the

work until he received notice from plaintiffs' representative at Prescott to the effect that said representative had the money for the annual work in his possession, and that he would continue such work at least until January 5, 1912, for which he would receive ordinary miner's wages. On the other hand, defendant McDonald contends, and he introduced substantial evidence in support of his contention, that he refused said offer, and informed plaintiffs' representative that he would not trust plaintiffs' promise to send the money; that defendant would cause the annual work to be done on condition that they pay the money first, and on no other condition. The court and jury find this contested fact for the defendant. We will not disturb such finding, supported by substantial evidence, merely because the evidence is conflicting.

That McDonald performed such work as shown by the evidence for his own benefit and as his only remaining hope of collecting his account due from the estate is conclusive. That the plaintiffs did not adopt this work as their work done for the purpose of the annual work and for the purpose of the estate is a reasonable inference to be drawn from all the facts and circumstances in evidence that transpired at the time of the visit of plaintiffs' representative to the mines on December 28th, and subsequent events. Mr. Linney, the representative, among other things, stated:

"I do not know now, and did not know then, definitely, the value of the work done by the men McDonald had there. My idea was from $60 to $100. I did not pay for the work done by the men hired by McDonald."

This evidence, considered as a whole, is convincing that McDonald was not on the property as an agent or representative of plaintiffs. The work was done voluntarily by McDonald for his personal benefit, but with the hope and expectation that plaintiffs would adopt the work as their work, and receive the benefit of it, so as to benefit defendant and permit him to accomplish his purpose; that is, effect a sale and collect his account. When plaintiffs' representative appeared and expressed no willingness to approve of the course McDonald had adopted to protect the property from forfeiture, and showed a disposition to deal with McDonald at arm's length, and then begin the performance of the annual work for the year 1911 without reference or regard to the work that McDonald had

caused to be done, and, by means of express contracts having reference to the future, to have the work done, as plaintiffs' work, the conclusive inference therefrom must necessarily be drawn that plaintiffs performed no annual work upon the mines during the year 1911. The work done by McDonald cannot justly be considered as plaintiffs' work. The facts and circumstances would not permit such inference to be drawn. The first alleged grounds for recovery are not sustained by the evidence. At the time Powell and J. T. McDonald initiated their relocations, January 1, 1912, and January 3, 1912, respectively, the plaintiffs had not performed any annual work on any of their locations for the year 1911. They began such work on January 16, 1912, after said defendants had initiated their relocations.

As a second grounds for recovery, plaintiffs contend that, conceding these said relocations were initiated before plaintiffs resumed work on January 16, 1912, such relocations cannot be effective as against plaintiffs' rights. The two reasons urged why the said relocations cannot affect plaintiffs' rights are stated under the second grounds for recovery and need not be again stated here. We will consider each in the order stated.

The fact that defendant J. T. McDonald went to the property for the purpose of performing the annual work on the mines in order to protect plaintiffs' title for his personal benefit, and, while there engaged in such work, he merely occupied a house on the ground, cannot in any sense be considered a trespass. After plaintiffs' representative visited the mines on December 28, 1911, said defendant, by continuing to occupy the house, could not be considered a trespasser on the mines. By plaintiffs' theory of the case, McDonald had an implied permission from plaintiffs' representative to remain there, and his occupancy of the property was the possession of plaintiffs. It is clear McDonald was not a trespasser asserting any rights adverse to plaintiffs' rights at any time prior to January 3, 1912.

Defendant Powell reached the mines on December 30, 1911. He was a friend of J. T. McDonald, and occupied the same house with McDonald by invitation. Powell's business at the mines at that time was twofold: First, to see a man residing near these mines; and, second, to relocate a part of the

ground covered by the plaintiffs' locations on the expiration of the year, if the annual work had not been done for the year 1911. Powell asserted no right to relocate any of the ground in question until the expiration of the year 1911, and then only upon the condition that the annual work had not been done. Powell did nothing in the way of initiating his relocations until after 12 o'clock midnight, December 31, 1911. At that time the ground became open to relocation because of plaintiffs' failure to perform the annual work thereon for the year 1911. Section 2324, U. S. Rev. Stats. (5 Fed. St. Ann., p. 19; U. S. Comp. Stats. 1901, p. 1426). If Powell had the right to relocate the property, he violated no right of plaintiffs by going on to the ground for that purpose. After 12 o'clock midnight, December 31, 1911, plaintiffs had no right to the exclusive possession of the locations in the group, and any qualified relocator could go upon the ground and relocate it, and in doing so commit no trespass to plaintiffs' rights. What we say of Powell can also be said of J. T. McDonald in this particular. The facts in evidence do not support this ground of contention under consideration. Plaintiffs did not commence to do any annual work on the property prior to January 1, 1912, and therefore no suspension of such work took place.

The second grounds for appellants' second contention are likewise without support in the evidence. Plaintiffs commenced to perform their annual work for the year 1911 on January 16, 1912, and after the relocations of Powell and J. T. McDonald had been initiated.

The said relocators thereby acquired the right to exclusive possession of the ground relocated by them, and the work done by the plaintiffs was without effect to restore any rights to plaintiffs in the ground so relocated; the said defendants owing no duty to plaintiffs, as we have shown above.

The evidence to the effect that the Lubec claim was no part of the Golden Eagle group, but a location disconnected from the group, is undisputed. That a sufficient amount of work was not performed upon the Lubec claim for the year 1910 is also uncontradicted. Defendant Quitty relocated the Lubec ground in September, 1911, and he thereby acquired a superior title thereto.

The Dalton relocation remains to be noticed. Dalton relocated a part of the grounds claimed by plaintiffs in September, 1912. On January 16, 1912, plaintiffs resumed work on the Golden Eagle group by starting one man to work thereon, with the instructions to continue the work until the annual work for the year 1911 was completed. No evidence was offered to show on which location of the group this work was started. Plaintiffs' witness testifies that he put the man to work on the group, and the man informed witness that the work was finished about the 1st of August, 1912. No objection was raised to the hearsay evidence upon the grounds that it was hearsay. The court found for the defendant Dalton, and this finding can be supported upon the theory that the work so resumed and performed was performed upon other ground within the group than upon the ground included within the Dalton relocation. At the time the work was resumed both J. T. McDonald and Powell had initiated their relocations, thereby appropriating a large part of the group and destroying the group identity. In order that plaintiffs' work be considered as work done upon the group for the benefit of the Dalton ground, such work must necessarily have been done on ground owned by and in the right and possession of plaintiffs, which would tend to develop the said Dalton ground. Such fact does not appear from the evidence. If the work was resumed and finished as testified to, but done on ground covered by the relocations of J. T. McDonald or Powell, such work would not suffice as the annual work for other locations of the original group, not covered by the relocations. This inference can readily be drawn from the evidence that the work was not done by plaintiffs on the ground covered by the Dalton relocation, nor on other ground owned by, or in the possession of, plaintiffs for the benefit and development of the ground covered by such relocation, and therefore the Dalton relocation is deemed valid, and has precedence over any claim of plaintiffs.

The judgment appealed from is affirmed.

FRANKLIN, C. J., and ROSS, J., concur.

Application for rehearing denied.

NOTE.—The question as to when a mining claim is subject to relocation is treated in a note in 68 L. R. A. 833.